IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAVID ALLEN CANNADY                                                    PLAINTIFF

        v.                          Civil No. 5:16-cv-05039

SHERIFF KELLEY CRADDUCK;
DR. SAEZ; NURSE TYRANNY RAY;
NURSE PATRICIA DAVIS; B.
FRISCHMAN, Maintenance                                                 DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff David Allen Cannady pursuant to 42 U.S.C. § 1983. The Plaintiff proceeds *pro se* and *in forma pauperis.* He is incarcerated in the Arkansas Department of Correction (ADC), Grimes Unit. At all times relevant to this case, Plaintiff was incarcerated in the Benton County Detention Center (BCDC). While at the BCDC, he maintains he was subjected to unconstitutional conditions of confinement and denied adequate medical care.

The case is currently before me on the Defendants' motions for summary judgment. The Benton County Defendants, Sheriff Cradduck and B. Frischman, filed a summary judgment motion (Docs. 24-26). The Medical Defendants, Dr. Saez, Nurse Ray, and Nurse Davis also filed a summary judgment motion (Docs. 28-31).

A hearing was held on October 11, 2016, to allow the Plaintiff to orally respond to the motion. Plaintiff appeared by video from the ADC. The motions are now ready for decision.

-1-

### 1.  Background

Plaintiff was incarcerated in the BCDC from June 9, 2015, until his transfer to the ADC on March 1, 2016.  *County Defendants' Exhibit* (hereinafter *Cty. Defts' Ex.*) A-1 at 1 & 30. Plaintiff was screened for TB on June 24, 2015.  *Cty. Defts' Ex.* A-2 at 36.

Plaintiff testified that his claims against Sheriff Helder and B. Frischman, a maintenance worker, are based on their failure to keep the facility at a comfortable temperature level, the lack of a working tuberculosis (TB) machine, the lack outside exercise, and being housed with inmates who had infectious diseases.[1]  Plaintiff testified that the temperature was not consistent. In the winter, he indicated that frost or ice would form on exterior walls.  In the summer, he testified it was so hot that people would take off all their clothes.  He indicted he was worried about suffering a heat stroke.  He admitted that he did not suffer a heat stroke or seek medical attention for a heat related illness.

Plaintiff submitted a grievance about the heat on June 22, 2015.  *Cty. Defts' Ex.* A-3 at 53.[2]  Plaintiff testified he frequently complained orally to the jailers about the cold or heat.  He states he did not always submit grievances because he is dyslectic and would have to have someone write the grievance for him.

The first grievances he submitted about the cold were dated November 22, 2015.  *Cty. Defts' Ex.* A-3 at 73-75.  He submitted additional grievances on December 1st, 2nd, ant 15th. *Id.* at 79-85.  In 2016, he submitted grievances on January 16th, 17th, 26th, 27th, 29th, 30th, and February 4th.  *Id.* at 95-106.  Plaintiff filed this lawsuit on February 18, 2016.

---

[1]In his complaint, Plaintiff also alleged the diet was inadequate.  However, at the hearing, he testified that he had no complaint about the diet he received.

[2]Page citations to this exhibit are to the jail file page that appears at the center of the bottom of the page.

Plaintiff testified it was cold when he was in E-107 and E-100.  It was freezing at night and Plaintiff testified he lost a lot of sleep.  He would get to sleep, wake up because of the cold, and then try to get to sleep again.  He testified he would do this approximately two to three times a night.  He estimated each time he got up he lost thirty to forty-five minutes of sleep.  However, he testified there were several days in a row that he could not sleep at all because of the cold.  *See Cty. Defts' Ex.* B at 63-64 (no sleep ten nights and 60 to 90 days woke up and moved around for thirty to forty-five minutes at a time).[3]

On weekends, Plaintiff stated that the temperature would drop on Friday evenings and stay cold until Monday or when maintenance workers returned to work.  Plaintiff thought it was unusual that the heating and air system frequently broke down on most weekends.  *See also Cty. Defts' Ex.* B at 70-71.  He suspected the temperature was being turned down deliberately.

Plaintiff testified about one particular time when he was in a two man corner cell when the frost formed on the exterior wall.  When asked how often this occurred, he specifically recalled this happening twice when he was in that cell but he was sure it happened more times than that.  The bunks were connected to an exterior wall which consisted of concrete block.  There were two vents on the opposite wall.  One pulled air into the cell and the other pulled the air out.  Plaintiff testified you could not feel any heat blowing into the room.

When the inmates complained about the temperature, one of the maintenance men would check the temperature by pointing a "gun" at the vents.  They never told the inmates what the reading was.  Further, they always checked the temperature in the day room that had no exterior walls but never in the cells. Plaintiff testified he did not know where the thermostats were.

---

[3]Page references are to the deposition page numbers and not the CM/ECF page number.

Inmates wore jump suits consisting of a shirt and pants, boxers, and a pair of socks.  With the exception of getting two blankets for a period of time he was in a corner cell which have two exterior walls, he only had a single blanket.  When he met with his attorney, it was not in his cell.

Jail standards require the temperature to not be below 65° or above 85°.[4]  *Cty. Defts' Ex. C* at ¶ 2.  Frischman indicates that while it is "difficult to regulate" temperature in the detention center "due to its block construction, in my entire 18 year employment, the temperatures in the [BCDC] have rarely exceeded 85 degrees and not dropped below 65 degrees."  *Id.* at ¶ 3.

Frischman does indicate that in the early summer of 2015, there was a problem with the "chillers" not cooling correctly.  *Id.* at ¶ 4.  Frischman attempted to address the problem by having the coils cleaned.  *Id.*  When this did not work, replacement chillers were ordered.  *Id.*  During this repair process, Frischman states that at no time was he "aware of the temperature in the [BCDC] exceeding 79 degrees."  *Id.* at ¶ 11.

In the summer months, Frischman indicates he sets the thermostats to 70 degrees.  *Id.* at ¶ 12.  Due to the size and construction of the building, this results in a temperature that consistently remains between 72 and 78 degrees.  *Id.*

In the winter months, Frischman indicates he sets the thermostats at 74 degrees.  *Id.* at ¶ 13.  This results in the temperature consistently remaining between 67 and 77 degrees.  *Id.*  According to Frischman, each time a maintenance complaint or request is received, someone in the maintenance department checks the problems and addresses them as soon as possible.  *Id.* at ¶ 15.

---

[4]Temperatures are stated in the Fahrenheit temperature scale rather than the Celsius scale.

When he is at home, Plaintiff testified he sets his thermostat between 75° and 85°.  This is a normal temperature to him.

Plaintiff testified that during the winter months he had a cold and runny nose.  He did not go to the doctor because there was a charge every time you saw any of the medical staff.  Plaintiff testified he was not getting very much money put in his inmate account.  He indicated medical staff usually responded to requests put on the kiosk within the day.  He did get treated for back pain while at the BCDC.

Since he has been at the ADC, Plaintiff has not been screened for Hepatitis C.  He does not know if any inmates at the Grimes facility have HIV.

Plaintiff testified the TB machine was broken and never worked in the pod.  He felt this is why the inmates were not given TB tests.  Plaintiff could not recall having asked for a TB test.  He believed it was the Sheriff's responsibility to fix the TB machines.

With respect to exercise, Plaintiff testified that the inmates were never given outside recreation.  Instead, he testified you were kept in the pod and had to attempt to exercise there.  Plaintiff indicated that inmates were locked out of their cells from 7:00 a.m. until about 2:30 or 3:00 p.m. and then again from 5:00 p.m. until 7:00 p.m.  The open area in the pod was referred to as the day room.  According to Plaintiff, about the only exercise the inmates were allowed to engage in was to walk around in circles.  Plaintiff testified that the inmates were told they could not do other exercises in the day room.  Plaintiff testified the inmates could do sit ups when confined to their cell.

Plaintiff testified his health was jeopardized by being housed with inmates who had infectious diseases such as HIV or Hepatitis C and were undergoing treatment.  At the time, Plaintiff said he did not know HIV could only be transmitted through direct contact with the

-5-

bodily fluids of an infected individual through injection into the blood or contact with mucous membranes which are found inside the rectum, vagina, penis, and mouth.[5]  He was unaware of any inmate who had active TB.  He testified he was forced to use the same bathroom facilities and was forced to spend long periods of time in the day room with the inmates who had infectious diseases.

Plaintiff testified he was unsure who was responsible for assigning inmates to given pods.  However, he testified his complaint against the doctor and nurses was based on their failure to separate inmates with infectious diseases.

## 2.  Legal Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or

---

[5]https://www.aids.gov/hiv-aids-basics/hiv-aids-101/how-you-get-hiv-aids/ (accessed December 15, 2016).

suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

As noted above, two separate summary judgment motions have been submitted. We will address each in turn.

### (A). The County Defendants' Motion

The County Defendants contend they are entitled to summary judgment on the grounds that the Plaintiff was not subjected to unconstitutional conditions of confinement. They also argue that the Plaintiff suffered no physical injury. Next, they maintain there was no proof of personal involvement on the part of Sheriff Cradduck. Finally, they argue there is no basis for official capacity liability.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Circuit applies the same deliberate indifference standard to pretrial detainees as applied to convicted inmates. See Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standard of the Eighth Amendment applies to claims, brought by pretrial detainees and convicted inmates, that prison officials failed to provide adequate food, clothing, shelter, etc.).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions involving "wanton and unnecessary

-7-

infliction of pain," or that are "grossly disproportionate to the severity of the crime." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. <u>See Revels v. Vincenz</u>, 382 F.3d 870, 875 (8th Cir. 2004) (<u>citing Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" <u>Revels</u>, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." <u>Revels</u>, 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976).

Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. <u>Irving v. Dormire</u>, 519 F.3d 441 (8th Cir. 2008). However, Plaintiff must show that his living conditions denied him of minimal measure of life's necessities. <u>Williams v. Delo</u>, 49 F.3d 442, 445 (8th Cir. 1995). Plaintiff must show that the condition he complains of posed a substantial risk of serious harm to his health. <u>See Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

## (1).  Sheriff Cradduck

Defendants maintain there is no evidence in the record to suggest Sheriff Cradduck was personally involved in any of the alleged constitutional violations. I agree. Under § 1983, supervisors may not be held liable based on *respondeat superior*. <u>See e.g., Tlamka v. Serrell</u>,

-8-

244 F.3d 628, 635 (8th Cir. 2001).  In other words, Sheriff Cradduck may not be held liable merely because he employed the other Defendants.  To be held liable for a constitutional violation, Sheriff Cradduck must have been personally involved in the unconstitutional conduct, deliberately indifferent to it, or tacitly authorized the constitutional violation.  Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990).  Plaintiff has offered no facts that suggest Sheriff Cradduck was involved in the alleged constitutional violations or even aware of those violations.  Mavorga v. Missouri, 442 F. 3d 1128, 1132 (8th Cir. 2006)("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights")(internal quotations omitted).  Sheriff Cradduck is entitled to judgment in his favor.

### (2).  Temperature

In Gordon v. Faber, 973 F.3d 686 (8th Cir. 1992), the Eighth Circuit addressed the issue of inmates' exposure to cold temperatures.  In that case, inmates were sent outdoors for exercise while the guards conducted a search.  The outside recreation yard "provided no protection from the elements.  The temperature outdoors that day was sub-freezing and the wind chill factor significant." *Id.*  at  687.  The inmates were provided with coats but no hats or gloves.  *Id.*  The inmates were outside for between an hour and an hour and forty-five minutes.  *Id.*  The Eighth Circuit affirmed the finding that deliberate indifference was shown when the inmates were ordered outdoors without hat and gloves, that the deprivation was extreme, and that the conduct denied the inmates the minimal civilized measure of life's necessities.  *Id.* at 687-688.

In general, in determining whether the exposure to cold violates the Eighth Amendment, courts have looked to the severity of the cold, its duration, whether the prisoner had an alternative means to protect himself from the cold, and whether the prisoner must endure other uncomfortable

-9-

conditions.  Dixon v. Godinez, 114 F.3d 640, 642-644 (7th Cir. 1997)("[J]ust because low temperature forces a prisoner to bundle up in a coat and blanket does not necessarily mean that prison conditions violate the Eighth Amendment"); see also Fox v. Vickers, No. 3:12-cv-03034, 2014 WL 722599, *5 (W.D. Ark. Feb. 26, 2014)(Plaintiff alleged he had to remain huddled under his two blankets to stay warm.  However, facility compliance reports indicate the jail was kept at a proper level and Plaintiff was only at the detention facility for a short period of time").

Here, Plaintiff complained of the cold from November until February.  According to Plaintiff, when the temperature was checked by Frischman, or some other maintenance employee, it was done in the day-room, which had no outside walls, and during the day-time when thirty to forty inmates would be in the room.  Plaintiff indicates the clothing and blanket he had were insufficient to combat the cold and that he would get up and move around the cell until he was warm enough to return to bed.  Plaintiff testified that the cold was so severe that ice formed twice on the exterior cell wall to which his bunk was attached.  I believe there are genuine issues of material fact as to this claim against Frischman.

### (2).  TB Lights/Machines

Plaintiff contends his rights were violated because the TB "machine" in the pod was broken and Defendants did nothing to repair it.  Plaintiff that because the "machine" was broken inmates were not tested for TB.  However, Plaintiff knew of noone who had active and therefor contagious TB.  Plaintiff submitted no evidence to suggest that he was exposed to TB or faced a substantial risk of serious damage to his health because the TB "machine" was inoperable.  See e.g., Helling v. McKinney, 509 U.S. 25, 35 (1993).  Plaintiff made no showing that there were any inmates at the BCDC infected with TB; or that the County Defendants failed to abate a risk of infection; or that any of the County Defendants acted with a sufficiently culpable state of

-10-

mind.  In sum, there is no genuine issue of fact as to whether there was an unreasonable risk of serious damage to his future health because of the failure to provide a working TB "machine" at the facility.  The County Defendants are entitled to summary judgment on this claim.

### (3).  Exercise

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs.  <u>Wishon v. Gammon</u>, 978 F.2d 446, 449 (8th Cir. 1992).   A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened."  *Id.*  Among factors the court should consider in reviewing such a claim are:  (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement.  *Id.*

Plaintiff's primary complaint is that they were never given outside exercise.  He concedes he could exercise in his cell by doing simple calisthenics such as sit ups or push ups.  He concedes he could exercise by walking around the day-room.  However, he testified that he was told the only exercise allowed in the day-room was walking.  He does not allege he suffered any physical injury or decline in his health because of the lack of outdoor exercise.

By affidavit, Megan Rutledge, an administrative assistant to Captain Lynn Hahn, asserts that inmates are provided with regular opportunities for exercise outside their sleeping quarters.  *Cty. Defts' Ex.* A at ¶ 13.  Rutledge indicates the "day room is large enough to allow space for walking or other exercises such as sit ups, jumping jacks, or push ups."  *Id.*  Further, "when weather permits, detainees may be allowed outside in a recreation yard that is also large enough for walking and other exercises."  *Id.*  Barring unusual circumstances, Rutledge indicates the inmates are allowed at least one hour in the day room or recreation yard each day.  *Id.*

-11-

Here, Plaintiff was outside his cell for much of the day.  He was able to exercise in the day room or in his cell.  Campbell v. Cauthron, 623 F.2d 503, 507 (8th Cir. 1980)("each inmate that is confined to his cell for more than sixteen hours per day shall ordinarily be given [a meaningful] opportunity to exercise for at least one hour per day outside the cell. . . . Merely allowing the inmates to walk around in the narrow corridor between cells does not provide adequate exercise"). "Requiring an inmate to exercise in an enclosed area is not itself a per se violation of the Eighth Amendment, nor does a limitation of three hours per week of out-of-cell exercise necessarily violate the Constitution."  Hosna v. Neal, 80 F.3d 298, 306 (8th Cir. 1996)(citations omitted).

Although it is possible that the denial of access to outdoor exercise may rise to the level of a constitutional violation, there is no genuine issue of material fact as to whether it rose to a unconstitutional level in this case.  See e.g, Fogle v. Pierson, 435 F.3d 1252, 1260 (10th Cir. 2006)("[A] factfinder might conclude that the risk of harm from three years of deprivation of any form of outdoor exercise was obvious and that DOC official disregarded that risk by keeping Fogle in administrative segregation").   Plaintiff's alleged lack of access to the outdoor exercise facility, viewed objectively, is not sufficiently serious and Defendants' actions, viewed subjectively do not demonstrate deliberate indifference to Plaintiff's health or safety.  Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998).  The County Defendants are entitled to summary judgment on this claim.

### (4).  Infectious Disease

Plaintiff has alleged that he was housed with inmates with serious contagious diseases. In Helling v. McKinney, 509 U.S. 25, 33-34 (1993), the Supreme Court held that the Eighth Amendment protects against future harm to inmates if the Plaintiff proves threats to personal safety from conditions, such as mingling of inmates with serious contagious diseases with other

-12-

inmates; and, if the conditions establish deliberate indifference to a substantial risk of serious

harm.

     With respect to TB, "[i]t is well known that TB is a serious disease harmful to the lungs

and other organs and that prisons are high risk environments for tuberculosis infection." Butler

v. Fletcher, 465 F.3d 340, 342 (8th Cir. 2006) (internal quotation marks and citation omitted).

As discussed in Butler:

> infected persons have either active TB, which is contagious, or inactive TB,
> which is suppressed by the immune system and not contagious. TB is spread
> when a person with active TB coughs, sneezes, or exhales. More than a few days
> exposure is usually required to contract the disease. A person with active TB is
> no longer contagious once treatment begins. Thus, in a prison setting, an inmate
> diagnosed with active TB should be segregated from the general population for
> treatment until the inmate is no longer infectious.

Butler, 465 F.3d at 342 (footnote and citations omitted).

     Here, Plaintiff testified that he did not know if he was housed with anyone who had

active TB.  Absent some suggestion in the summary judgment record that Plaintiff was housed

with someone with active TB, there is no genuine issue of material fact with respect to Plaintiff's

being housed with individuals having TB.  Merely being housed with someone having inactive,

non-contagious, TB is insufficient to state a claim, as there was no risk of developing the disease.

Id.

     With respect to HIV and AIDS, Plaintiff testified the inmates used the same sinks, toilets,

and showers and the disease could be spread through contact with the blood of an infected

person. In Glick v. Henderson, 855 F.2d 536, 539 (8th Cir. 1988), the Plaintiff alleged that he

was at risk of contracting AIDS

AO72A
(Rev. 8/82)

> because (1) he comes into contact with the sweat of other inmates during work
> detail; (2) he is subject to bites from mosquitoes which have bitten other inmates;
> (3) he has been sneezed on by a known homosexual; (4) A.D.C. officials untested
> for AIDS prepare his food; and (5) the A.D.C. regularly transfers prisoners from
> cell to cell throughout the prison.

*Id.*   The Eighth Circuit found these allegations to be "based on unsubstantiated fears and ignorance."  It held that "[t]he possibility of AIDS transmission through these means is simply too remote to provide a proper basis" for the complaint.  *Id.*; see also Marcussen v. Brandstat, 836 F. Supp 624 (N.D. Iowa 1993)(The possibility of transference of AIDS through everyday contact is simply too remote to show that there is a pervasive risk of harm to inmates and a failure of prison officials to reasonably respond to that risk).

In Robbins v. Clarke, 946 F.2d 1331 (8th Cir. 1991), the court affirmed the district court's holding that "the failure to segregate HIV-positive prisoners from the general population does not constitute cruel and unusual punishment of the uninfected prisoners."  *Id.* at 1333.  In Marcussen, the inmate claimed that "prison officials exposed him to a pervasive risk of harm by allowing other inmates to use sharp objects, such as a razor, that could cause blood-to-blood transmission of HIV."  Marcussen, 836 F. Supp. at 628.  The Court rejected the plaintiff's claim noting that other courts had rejected claims involving allegations that a former cellmate with AIDS tampered with his toothbrush, toothpaste, and razor blade.  *Id.* (citing Johnson v. United States, 816 F. Supp. 1519 (N.D. Ala. 1993)).  In Johnson, the plaintiff also alleged he observed his cellmate's blood on their sink, toilet and towels.  Johnson, 816 F. Supp. at 1521.  The court held that plaintiff had not presented facts or allegations that the decision to house him with an AIDS infected individual evidenced a culpable state of mind on the part of defendant.  *Id.* at 1524.

-14-

In <u>Wilmoth v. Hamblen County Jail Staff</u>, No. 2:09-cv-121, 2009 WL 4807622 (E.D. Tenn. Dec. 9, 2009), the Plaintiff alleged that an HIV positive inmate spat on him. *Id.*, *1. The Court found no claim was stated because:

> there is no contention that any defendant knew that plaintiff's HIV-positive cell mate spat on plaintiff; that the HIV-afflicted inmate was prone to do so; or that he was predisposed to commit acts which posed a risk of transmitting the disease. Logically, unless a defendant actually knows about an unsafe condition, he cannot consciously disregard any attendant risk of serious harm to an inmate's health or safety. Therefore, because the state-of-mind element of an Eighth Amendment claim is missing, plaintiff has failed to state an independent claim involving his HIV-positive cell mate.

*Id.* at *3.

In this case, Plaintiff's alleged exposure is even more remote than that rejected in the above cases. HIV and AIDS are not spread through casual contact. Plaintiff has failed to allege behavior from infected inmates that exposed him to a pervasive risk of harm. The possibility that he might contract HIV or AIDS through blood in the shower is too remote and insufficient to establish a pervasive risk of harm. Defendants are entitled to summary judgment on Plaintiff's claims with respect to being housed with inmates with HIV and AIDS positive inmates.

With respect to Hepatitis C, Plaintiff alleges he was exposed to the blood of an inmate with Hepatitis C through the showers. He testified that when you have boils, cuts, sores, they bleed when the water gets the scabs wet, they come off. The showers were not cleaned before he showered or after he showered. He has not alleged that the inmate or inmates had boils, cuts, or sores. Hepatitis C is spread "when blood from a person infected with Hepatitis C enters the body of someone who is not infected." *Centers for Disease Control and Prevention*, http://www.cdc.gov/hepatitis/hcv/cfaq.htm (accessed December 27, 2016). It is not spread

-15-

through the air, through casual contact, through sharing eating utensils, coughing, sneezing, food, or water. *Id.*

Plaintiff has not alleged that the infected inmate had a history or risky behavior that would increase the likelihood of transmission.  The mere possibility that he could contract Hepatitis C through blood in a shower is too remote to establish a pervasive risk of harm.  The Defendants are entitled to summary judgment on this claim.

### (B).  The Medical Defendants' Motion for Summary Judgment

Plaintiff testified that the Medical Defendants denied him a TB test and/or other necessary tests, and housed him with inmates with contagious diseases.  The Medical Defendants argue: (1) Plaintiff did not endure unconstitutional conditions of confinement; (2) there is no proof that Plaintiff suffered from a serious medical need; and (3) they were not deliberately indifferent to Plaintiff's serious medical needs.

### (1).  Unconstitutional Conditions of Confinement

Plaintiff claim against the medical Defendants is premised on their failure to segregate those inmates with contagious diseases.  As discussed above, there is no genuine issue of material fact as to whether the conditions Plaintiff was incarcerated under violated the Constitution.

### (2).  Denial of Medical Care

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the "government's obligation to provide medical care for those whom it is punishing by incarceration.  An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.  Estelle v. Gamble, 429 U.S. 97, 103

-16-

(1976)(internal quotation marks and citation omitted). "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002)(citing Estelle, 429 U.S. at 104); see also Christian v. Wagner, 623 F.3d 608, 613 (8th Cir. 2010)("The Eighth Amendment does not apply to pretrial detainees, but the Due Process Clause of Fourteenth Amendment imposes analogous duties on jailers to care for detainees").

In order to succeed on a denial of medical care claim, an inmate must show both that he had an objectively serious medical need and that the defendant was deliberately indifferent to that need. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)(citations omitted). "A medical need is serious when it has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006)(citation omitted). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." Dulany v. Canaan, 132 F.3d 1234, 1239 (8th Cir. 1997)(citation omitted). "[A] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." Taylor v. Bowers, 966 F.2d 417, 421 (8th Cir. 1992).

Here, there is no genuine issue of material fact as to whether the Medical Defendants were deliberately indifferent to Plaintiff's serious medical needs. There is nothing in the record that shows the Plaintiff's health was impaired because he was housed with any inmate who had a

-17-

contagious disease.  Further, Plaintiff did not testify that any of the allegedly infected inmates engaged in behavior that exposed him to him to a pervasive risk of harm.  As discussed above, the diseases cannot be spread through casual contact.

With respect to Plaintiff's other medical needs, the records indicate the Plaintiff was seen by medical staff and treated appropriately.  When Plaintiff complained of back pain, he was prescribed Ibuprofen and when that did not relieve the pain the dosage was increased.  When he complained that the increased dosage of  Ibuprofen was not effective, he was prescribed Gabapentin.  A urinalysis was also done to determine if Plaintiff had a urinary track infection.  As a result of the lab report, Plaintiff was placed on an antibiotic.

The Medical Defendants are entitled to summary judgment in their favor.

**4.  Conclusion**

For the reasons stated, I recommend that the motion for summary judgment (Doc. 24) filed by the Benton County Defendants should be granted with respect to all claims against Sheriff Cradduck and all other claims except Plaintiff's unconstitutional conditions of confinement claim based on the cold temperature in his cell.  I further recommend that the Medical Defendants summary judgment motion (Doc. 28) be granted.  All claims against Dr. Saez, Nurse Ray, and Nurse Davis should be dismissed.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties**

-18-

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of December 2016.


/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-19-

AO72A
(Rev. 8/82)