IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**DAVID ALLEN CANNADY**                                    **PLAINTIFF**

v.                          **Case No. 5:16-cv-05039**

**SHERIFF KELLEY CRADDUCK;**
**DR. SAEZ; NURSE TYRANNY RAY;**
**NURSE PATRICIA DAVIS;**
**B. FRISCHMANN, Maintenance**                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is the Report and Recommendation ("R&R") (Doc. 34) of the Honorable James R. Marschewski, United States Magistrate Judge for the Western District of Arkansas, filed in this case on December 29, 2016, regarding Defendants Sheriff Kelley Cradduck's and B. Frischmann's (together, the "County Defendants") Motion for Summary Judgment (Doc. 24) and Brief in Support (Doc. 25) and Separate Defendants Dr. Saez's, Tyranny Ray's, and Patricia Davis' (collectively, the "Medical Defendants") Motion for Summary Judgment (Doc. 28) and Brief in Support (Doc. 29). In the R&R, the Magistrate Judge recommended that the Court grant the Medical Defendants' Motion in its entirety, and grant in part and deny in part the County Defendants' Motion.

The Court has reviewed the recommendations concerning the Medical Defendants' Motion, to which no objections were filed. As the Court agrees that these claims should be dismissed, the Court will grant the Motion and dismiss the Medical Defendants from the case. As to the County Defendants' Motion, the Magistrate Judge recommended that all claims against them also be dismissed, with the exception of an

1

individual capacity claim made against Defendant Frischmann. This claim relates to Plaintiff David Allen Cannady's assertion that he was subjected to excessively cold temperatures in his cell, and that Frischmann, a maintenance supervisor, was put on notice of the cold temperatures but was deliberately indifferent to them. Frischmann filed Objections to the R&R (Doc. 35), and in response, the Court has now conducted a *de novo* review as to all proposed findings and recommendations pertaining to the claim against Frischmann. 28 U.S.C. § 636(b)(1). In addition to evaluating this claim, the Court's Order will also address the official capacity claims made against the County Defendants, which are subject to dismissal, but which the R&R did not substantively discuss. Accordingly, the Court finds that the R&R should be, and hereby is, **ADOPTED AS MODIFIED**, with the additional reasoning and expanded analysis set forth below.

## I. BACKGROUND

On February 18, 2016, Cannady filed his Complaint against the County Defendants and Medical Defendants, maintaining that his constitutional rights were violated while he was incarcerated at Benton County Detention Center ("BCDC"). As to the County Defendants, Cannady claimed that he was subjected to unconstitutional conditions of confinement because the temperatures in his cell were too hot in the summer[1] and too cold in the winter.

Cannady was temporarily held at BCDC beginning on June 9, 2015, until he was transferred to the Arkansas Department of Corrections, Grimes Unit, on March 1, 2016.

---

[1] Cannady submitted one grievance as to the excessive heat on June 22, 2015. During the summary judgment hearing, Cannady agreed that Defendants fixed the problem with the "chillers" on the air conditioning unit, and that he suffered no medical effects from it. Accordingly, the Magistrate Judge recommended dismissing this claim, and Cannady did not object.

2

See Doc. 26-2, pp. 1, 11. Cannady first began complaining about the cold temperatures in the BCDC on November 22, 2015, when he submitted his first grievance about the cold. See Doc. 26-4, p. 12. Cannady went on to file a total of thirteen grievances about the cold temperatures in the prison from November 22, 2015, to February 4, 2016. See id. at pp. 14, 16, 18-19, 22-23, 26-32. Nine of the thirteen grievance complaints were directed towards the cold temperatures in Cannady's cell[2] and/or the fact that Cannady could not sleep in his cell because it was too cold. See id. at pp. 14, 16, 18-19, 26-30. At the summary judgement hearing, Cannady testified that there was a heating vent on the interior wall of his cell but that he could not feel any heat coming from the vent and that the cold was so severe that ice formed at least twice on the exterior cell wall to which his bunk was attached. Cannady further testified that, each time he complained about the cold temperatures, an individual from maintenance would check the temperature by pointing a "gun"[3] at a vent in the pod day room, which has no exterior walls.

In order to help combat the cold, inmates are ordinarily given one blanket, but, if they are placed in a corner cell with two exterior walls, then they are given two blankets. See Doc. 26-7, p. 3. Cannady testified that inmates are also given a full set of clothing, which consists of a shirt, pants, boxers, and a pair of socks, but that the blanket(s) and clothing were not adequate to combat the cold in his prison cell. As a result, Cannady testified that he acquired a cold and a runny nose and that it was too cold to sleep, which

---

[2] The numbers assigned to each room in the BCDC are unclear from the record. It appears to the Court that Cannady was housed in cells E-153 and E-154 during all periods relevant to this case and that E-107 and E-103 are the "pod day rooms." See Doc. 26, pp. 10-13.
[3] The record does not describe the apparatus that maintenance used to check temperatures, which Cannady recounts as a "gun," but the Court presumes the device to be some type of infrared thermometer.

3

caused him to go without sleep for a total of approximately ten nights during his period of confinement at BCDC. *See* Doc. 26-6, pp. 63-64. Cannady further testified that the cold caused him to spend another 60-90 nights waking up because of the cold two to three times each night, walking around his cell to get warm, and losing approximately 30-45 minutes of sleep each time. *See* Doc. 26-6, pp. 63-64. Cannady suspected the temperature was being turned down deliberately prior to the weekend until Monday or when maintenance workers returned to work. He also believed the temperature was set incorrectly, but does not believe that the facility-wide heating and cooling system was broken during this time. *See* Doc. 26-6, p. 86.

During all times relevant to this case, Frischmann was employed by BCDC as a supervisor for maintenance and upkeep, a position that he has held for over eighteen years. *See* Doc. 26-7, p. 1. In that position, Frischmann regularly checks the temperatures in the BCDC to assure compliance with jail standards, which require the temperature not to exceed 85 degrees and not to drop below 65 degrees. *Id.* During the winter months, Frischmann sets the thermostats in the BCDC to 74 degrees, but, due to the construction of the building, Frischmann states the temperature varies between 67 and 77 degrees. *Id.* at 2. Frischmann further states in an affidavit, that, during his "entire 18 year employment, the temperatures in the [BCDC] have . . . not dropped below 65 degrees"—although he fails to provide any explanation as to why he knows this to be true or to provide supporting maintenance records. *See id.* at 1. His statement also fails to explain whether it pertains to temperatures of the facility in general, or to the individual cells, or both. *See id.*

4

Each time an inmate submits a facility-related grievance, whether it is based upon a complaint regarding cold temperatures or otherwise, Frischmann or another member of maintenance checks the problem and addresses it as soon as possible. *See id.* at 3. In the instant case, out of the nine grievances submitted by Cannady concerning the cold cell temperatures and/or the fact that he could not sleep in his cell because of the cold, seven of them were replied to in writing by Frischmann. *See* Doc. 26-4, pp. 14, 16, 18-19, 26-30. Frischmann's respective responses to such grievances were as follows: (1) "Temps are being checked daily."; (2) "This is an issue we are working on daily. We will get it in sync soon."; (3) "This is an issue we are working on daily. We will get it in sync soon."; (4) "We are working on this, now."; (5) "yes thanks"; (6) "ok"; (7) "ok." *See id.* at 14, 16, 19, 26-27, 29-30. From this record, it is unclear what problems related to temperature regulation actually existed in Cannady's cell or the pod in general, or what specific actions were taken to address the problems as soon as possible, other than simply checking the temperature.

Frischmann objects to the Magistrate Judge's recommendation that the Court preserve for trial Cannady's claim regarding the excessively cold temperatures in his cell. Frischmann argues that there are no genuine issues of material fact regarding the claim because: (1) any deprivation caused by the cold temperatures in Cannady's cell did not objectively rise to such a level that would pose a substantial risk of serious harm to Cannady's health or safety; (2) even if an objectively serious deprivation occurred, Frischmann was not deliberately indifferent to Cannady's health or safety; and (3) Cannady suffered no injuries from the cold temperatures.

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). When deciding a motion for summary judgment, the Court must consider all the evidence and draw all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op.,* 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is, therefore, entitled to judgment as a matter of law. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996).

Once the moving party has met this burden, the nonmoving party must set forth specific facts by affidavit and other evidence, showing that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e). Genuine issues of material fact exist where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. To withstand a defendant's motion for summary judgment, a plaintiff must substantiate his or her allegations with "sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Gregory v. Rogers,* 974 F.2d 1006, 1010 (8th Cir. 1992). Summary judgment is properly granted to a defendant where no reasonable jury could render a verdict for the plaintiff. *Taylor v. White,* 321 F.3d 710, 715 (8th Cir. 2003).

6

## III. DISCUSSION

Below the Court will address, first, Frischmann's objections to preserving Cannady's individual capacity claim against him, and, second, Cannady's official capacity claims against the County Defendants, which were not substantively addressed in the R&R. Both issues are discussed in turn.

### A. Unconstitutional Conditions of Confinement – Cold Temperatures

The Eighth Amendment protects a prisoner against cruel and unusual punishment during his or her confinement. *See* U.S. Const. amend. VIII; *see also Hutto v. Finney*, 437 U.S. 678, 685 (1978). As it relates to the treatment of prisoners, the Supreme Court has distinguished between two different kinds of conduct: (1) that which is part of the formal punishment imposed for a crime and (2) that which does not purport to be punishment, including the conditions of confinement, medical care, and restoration of control over inmates. *See Wilson v. Seiter*, 501 U.S. 294, 297-303 (1991). As to the latter, the Supreme Court has taken the position that harsh conditions and rough disciplinary treatment are part of the price that a convict must pay for his or her offenses against society. *See Rhodes v. Chapman*, 452 U.S. 337, 347-49 (1981). However, while the Constitution does not mandate comfortable prisons, it also does not permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment, however, "'has no application' until there has been a 'formal adjudication of guilt,'" [but] the Fourteenth Amendment gives state pretrial detainees—just as the Fifth Amendment gives federal pretrial detainees—rights which are '*at least as great* as the Eighth Amendment protections available to a convicted prisoner.'" *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (emphasis in original)

7

(quoting *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983)). "The Constitution

affords greater protection to a pretrial detainee compared to a convicted inmate in the

sense that '[d]ue process requires that a pretrial detainee not be punished.'" *Id.* (quoting

*Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979)). Therefore, "the burden of showing a

constitutional violation is *lighter* for a pretrial detainee under the Fourteenth Amendment

than for a post-conviction prisoner under the Eighth Amendment." *Morris v. Zefferi,* 601

F.3d 805, 809 (8th Cir. 2010) (emphasis added) (quoting *Wever v. Lincoln Cnty., Neb.,*

388 F.3d 601, 606 n.6 (8th Cir. 2004)). Although the Eighth Circuit has not established a

"clear standard for pretrial detainees," the Court has repeatedly applied the same

standard that is applied to Eighth Amendment claims made by convicted inmates.[4] *See*

*id.* (quoting *Vaughn v. Greene Cnty., Ark.,* 438 F.3d 845, 850 (8th Cir. 2006)).

Therefore, an individual challenging conditions of confinement in a prison must

prove both an objective and subjective element. *See Revels v. Vincenz,* 382 F.3d 870,

875 (8th Cir. 2004) (citing *Wilson,* 501 U.S. at 298). "The defendant's conduct must

objectively rise to the level of a constitutional violation by depriving the plaintiff of the

minimal civilized measure of life's necessities. The defendant's conduct must also reflect

a subjective state of mind evincing deliberate indifference to the health or safety of the

prisoner." *Id.* (citations and quotations omitted).

---

[4] Cannady was confined at the BCDC from June 9, 2015, until March 1, 2016, and was convicted on January 14, 2016. (Doc. 26-2, pp. 1-2). His complaints relating to the cold temperatures began on November 22, 2015, and lasted until February 5, 2016. (Doc. 26, pp. 10-13). Therefore, Cannady's claims relating to the cold cell temperatures that occurred before January 14, 2016, would arise under the Fourteenth Amendment and its "lighter" burden, *Morris,* 601 F.3d at 809, while his claims after that date would arise under the Eighth Amendment. However, because the Eighth Circuit applies the same standard to pretrial detainees as that applied to Eighth Amendment claims made by convicted inmates, the Court will discuss both timeframes together.

## 1. Objectively Serious Deprivation

In order to succeed in proving that certain conditions of confinement are unconstitutional, the plaintiff must first demonstrate that the conditions objectively rise to such a level that he or she is denied "the minimal civilized measure of life's necessities." *Id*. (citations omitted). The Eighth Amendment requires inmates to be provided with "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing)." *Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981) (citations omitted). To prove an unconstitutional deprivation, "a prisoner must show that conditions were more than uncomfortable, and indeed rose to the level of 'conditions posing a substantial risk of serious harm' to inmate health or safety." *DeSpain v. Uphoff,* 264 F.3d 965, 973 (10th Cir. 2001) (quoting *Farmer,* 511 U.S. at 834). Whether there is a substantial risk of serious harm depends on "the particular facts of each situation; the circumstances, nature, and duration of the challenged conditions must be carefully considered." *Id.* at 974. However, a plaintiff need not suffer an injury in order to prove that the conditions in which he was confined were, in fact, cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976). It is well settled that inmates have the right to adequate shelter, including "protection from extreme cold," *see McCarthy v. Mullins*, 2007 WL 437868, at *12 (W.D. Ark. Feb. 7, 2007) (quoting *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997)), and to "not be confined in a cell at so low a temperature as to cause

severe discomfort," *Del Raine v. Williford*, 32 F.3d 1024, 1034 (7th Cir. 1994) (citation and quotation omitted). In determining whether cold temperatures in a cell violate the Eighth Amendment, courts have examined the severity of the cold, its duration, whether the prisoner had alternative means that were adequate to protect himself from the cold, and whether the prisoner must endure other uncomfortable conditions. *See Dixon*, 114 F.3d at 644. Further, "the question of whether the severity of the cold, in combination with the length of time which the inmate had to endure it, was sufficient to violate the Eighth Amendment is one which will often be peculiarly appropriate for resolution by the trier of facts" rather than on summary judgment. *Id*. at 643.

"Because of the inherent subjectivity involved in deciding what is a comfortable temperature, th[e] [c]ourt looks to objective criteria to determine whether the cold in [a] case was severe." *Scotti v. Russell*, 175 F. Supp. 2d 1099, 1103 (N.D. Ill. 2001). Thus, a court should take note of any "concrete, objectively verifiable evidence . . . that demonstrates the degree of cold" in an inmate's cell. *See Dace v. Smith-Vasquez*, 658 F. Supp. 2d 865, 879 (S.D. Ill. 2009). Courts have consistently found allegations of items freezing inside the cell, including ice forming inside the cell on the cell wall, to provide the concrete, objectively verifiable evidence needed to survive summary judgment. *See, e.g., Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (holding that a genuine issue of material fact remained as to whether an objectively serious deprivation occurred when the plaintiff was exposed to cold temperatures for approximately three months and it was so cold that ice was forming in his toilet); *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997) (holding that a genuine issue of material fact remained as to whether an objectively serious deprivation occurred when the plaintiff's "unrefuted testimony that ice persistently

formed on the walls of the cells suggest[ed] that temperatures in the cell block were literally freezing, during the day as well as at night, and that this condition continued unchanged for several winters"); *Bennett v. Chitwood*, 519 F. App'x 569, 574 (11th Cir. 2013) (holding that no genuine issue of material fact remained as to whether an objectively serious deprivation occurred with one reason being that the "case [was] not one in which ice formed inside the cell"); *Diggs v. Godinez*, 1997 WL 308847, at *6 (N.D. Ill. June 3, 1997) (holding that a genuine issue of material fact remained as to whether an objectively serious deprivation occurred when the defendants' "argument [did] not rebut Plaintiff's assertion that ice often formed on the inside of [the plaintiff's] own cell, and that [the plaintiff] lacked extra blankets or a space heater" for one year); *Dillingham v. Schofield*, 2011 WL 3664470, at *8 (E.D. Tenn. Aug. 19, 2011) (finding that plaintiff stated a claim upon which relief may be granted when the plaintiff alleged that the temperature outdoors was below zero and that ice formed in the cell for a period of three days, which caused the skin on the plaintiff's fingers to crack and bleed).

While a plaintiff need not suffer an injury in order to prove that certain conditions of confinement are unconstitutional, courts have also noted that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *See Walker v. Schult*, 717 F.3d 119, 126–27 (2d Cir. 2013); *see also Wright v. McMann,* 387 F.2d 519, 521–22, 526 (2d Cir. 1967) (finding that the inmate stated an Eighth Amendment claim by alleging he was "forced to sleep completely nude on the cold rough concrete floor and that the cell was so cold and uncomfortable that it was impossible for him to sleep for more than an hour or two without having to stand and move about in order to keep warm"); *Tafari v. McCarthy,* 714 F. Supp. 2d 317, 367 (N.D.N.Y.

2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights." (citing *Harper v. Showers,* 174 F.3d 716, 720 (5th Cir. 1999))); *Robinson v. Danberg,* 729 F. Supp. 2d 666, 683 (D. Del. 2010) (denying motion to dismiss Eighth Amendment claims based on allegations that "defendants took specific acts designed to deprive [plaintiff] of sleep").

Here, a genuine issue of material fact remains as to whether the cold temperatures in Cannady's cell rose to such a level as to be an objectively serious deprivation under the Eighth and Fourteenth Amendments. Cannady complained of cold temperatures in his cell from November 2015 to February 2016—a period spanning approximately four months. Frischmann states that "[t]he undisputed evidence is that the temperature did not drop below 67 degrees in the facility under [his] watch," (Doc. 35, pp. 2-3), but this is not true. While it is undisputed that "the thermostats were set to 74 degrees" and "[t]he temperature during the winter is consistently between 67 to 77 degrees," (Doc. 26, p. 20), Cannady's unrefuted testimony is that maintenance only checked the temperature in the pod day room, which had no exterior walls, and not in his or any other inmate's cell, and that the temperature checks occurred during the day when thirty to forty inmates would be in the room. *See* Doc. 26-6, pp. 26-27, 68-69. This creates a question of fact as to the actual temperature in Cannady's cell. This is especially relevant because Cannady testified that there was a heating vent on the interior wall of his cell, but that he could not feel any heat coming from the vent. Cannady also testified that the cold was so severe that ice formed at least twice on the exterior cell wall to which his bunk was attached—indicating that the temperatures in the cell were literally freezing—which is exactly the type of concrete, objectively verifiable evidence in the record that many courts have found

12

to create a genuine issue of material fact as to the temperature in an inmate's cell. Viewing the facts in the light most favorable to Cannady, a reasonable jury could find that an inmate who is required to sleep in a cold cell with a malfunctioning vent that allowed no heat to flow into the cell for a period of approximately four months, including at least two nights where ice formed on the wall that supports the inmate's bunk, has suffered an objectively serious deprivation sufficient to create a substantial risk of harm to health or safety.

Frischmann also takes the position that Cannady was never subjected to "an unreasonable risk of serious damage to [his] health" because Cannady was fully dressed, "was given two blankets with which to cover himself," and "[t]here was no evidence that [Cannady] or any other inmate showed any signs of hypothermia." (Doc. 35, p. 3). While it is true that Cannady had access to clothing and blankets, developing hypothermia is not a prerequisite for bringing a claim for unconstitutional conditions of confinement due to the cold under the Eighth or Fourteenth Amendments. In fact, inmates need not suffer any injury to succeed on such claims. *See Helling*, 509 U.S. at 33.[5]

---

[5] The Eighth Circuit has stated that nominal damages may be awarded to vindicate a violation of an individual's constitutional rights if such deprivation has not caused an actual, provable injury. *See Westcott v. Crinklaw*, 133 F.3d 658, 662 (8th Cir. 1998) (citation omitted). In addition, punitive damages may be awarded in a § 1983 claim if a factfinder finds that a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Williams v. Hobbs*, 662 F.3d 994, 1011 (8th Cir. 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)) (citation and quotations omitted). Because a successful plaintiff bringing a § 1983 conditions of confinement claim need not suffer a present injury, and may be entitled to nominal and/or punitive damages even if no actual, provable injury is suffered, Frischmann's argument that Cannady has suffered no injury fails to establish a basis to grant summary judgment in Frischmann's favor in the instant case.

Even if it were true that inmates had to show some sort of present, objective injury caused by the cold, Cannady testified that the temperature in his cell was too cold to sleep. *See* Doc. 26-6, pp. 63-64. This caused him to go without sleep for approximately ten nights, and to spend another 60-90 nights waking up repetitively and walking around his cell to get warm. *See id.* Cannady lost approximately 30-45 minutes of sleep each time he was forced to do this. *See id.* While Frischmann argues that sleep loss is not a "physical injury," as other courts have noted, sleep is critical to our existence as humans, and a condition that causes sleep deprivation may violate an inmate's constitutional rights. *Cf. Tafari,* 714 F. Supp. 2d at 367. Additionally, Cannady complained about the excessively cold temperatures in his cell for a period of approximately 75 days. Viewing the facts in the light most favorable to Cannady, a reasonable jury could find that the cold temperatures in Cannady's cell that caused ten nights of sleeplessness plus another 65 consecutive nights of sleep loss was an objectively serious deprivation that created a substantial risk of harm to Cannady's health and/or safety.

In sum, material issues of fact remain as to whether the severity of the cold in Cannady's cell, its duration, and the adequate alternative means to protect himself from such cold created an objectively serious deprivation as to deny him of "the minimal civilized measure of life's necessities" guaranteed under the Eighth and Fourteenth Amendments. *See Revels,* 382 F.3d at 875 (citation omitted). As such, these questions are precluded from summary judgment and reserved for the trier of fact.

## 2. Deliberate Indifference

In addition to proving an objectively serious deprivation, the plaintiff must also prove a subjective element—that the defendant acted with a "sufficiently culpable state

of mind." *Wilson*, 501 U.S. at 298. With respect to condition of confinement claims, the "deliberate indifference" standard is used to determine whether the individual acted with such a state of mind. *Id.* at 301-05. Under this standard, individuals may be found liable for denying humane conditions of confinement only if they knew that an inmate faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it; the individual "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Farmer*, 511 U.S. at 837-42. In other words, "[t]he deliberate indifference element has two components: an actor must 'know[] of and disregard[] an excessive risk to inmate health or safety.'" *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (alterations in original) (quoting *Farmer,* 511 U.S. at 837).

### a.  Knowledge of the Risk

To meet the first component, a plaintiff "must first demonstrate that [a] defendant[] knew of the substantial risk of serious harm to the victim." *Letterman*, 789 F.3d at 862 (citing *Jackson v. Everett,* 140 F.3d 1149, 1152 (8th Cir. 1998)). However, the plaintiff is not required to show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk was obvious. *See, e.g.*, *Farmer,* 511 U.S. at 842–43 (explaining that factfinders can infer knowledge from a variety of sources and that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"); *Gregoire v. Class,* 236 F.3d 413, 417 (8th Cir. 2000) ("[T]his knowledge[, that the defendant was aware of a substantial risk of serious harm,] is subject to proof by all the usual ways, including inferences based on the obviousness of the risk."); *Jackson,* 140 F.3d at 1152 (stating that the question of

knowledge turns on "whether an excessive risk to [the inmate's] health or safety was known or obvious"). It is, therefore, "sufficient to show that 'the defendant[] being sued had been exposed to information concerning the risk and thus 'must have known' about it.'" *Letterman*, 789 F.3d at 862 (quoting *Farmer,* 511 U.S. at 842).

Here, there are genuine issues of material fact regarding whether Frischmann knew of the substantial risk of serious harm posed by the cold temperatures in Cannady's cell. Although Frischmann states that there is no proof in the record that he was personally aware of the cold temperatures, *see* Doc. 35, p. 2, Cannady filed thirteen separate grievances regarding the cold temperatures, nine of which specifically mentioned the cold temperatures in his cell and/or the fact that he could not sleep at night in his cell because of the cold temperatures. *See* Doc. 26-4, pp. 14, 16, 18-19, 22-23, 26-32. Frischmann personally replied to seven of these grievances. *See id.* These repeated complaints were specific enough to create a genuine issue of material fact regarding whether Frischmann was put on notice about the risk of harm to Cannady so that "he 'must have known' about it.'" *See Letterman*, 789 F.3d at 862 (quoting *Farmer,* 511 U.S. at 842); *see also McCarthy*, 2007 WL 437868, at *12 (stating that filing a grievance is only effective if an inmate submits a grievance or request that specifically mentions the condition of confinement, such as the cold temperatures in his or her cell or the need for additional heat, clothing, or bedding because of the cold); *Bennett*, 519 F. App'x at 575 (holding that the plaintiff failed to establish that the defendants acted with deliberate indifference when the plaintiff submitted complaints about not having clothes or "the situation generally" instead of the cold temperatures specifically).

Frischmann's final argument on this point is that he lacked specific knowledge that the temperature inside Cannady's particular cell was dangerously low at night and that such temperature could actually cause a serious injury. However, courts have not required a showing of specific knowledge of particular temperatures in order to meet the deliberate indifference test. Instead, the test is met when a defendant knows that the temperatures in a plaintiff's cell are cold. *See, e.g.*, *Dixon*, 114 F.3d at 645 (finding that there were questions of material facts regarding whether the defendants were deliberately indifferent when the defendants knew about the bitterly cold cells); *Walker*, 717 F.3d at 129-30 (finding that the plaintiff adequately alleged deliberate indifference when the plaintiff alleged that the defendants were aware of the plaintiff's cold cell). For these reasons, a genuine issue of material fact remains as to whether Frischmann knew of the substantial risk of serious harm to Cannady caused by the cold temperatures in Cannady's cell.

### b. Deliberate Disregard of the Risk

Once the knowledge component has been satisfied, then the plaintiff "must demonstrate [that] the actor deliberately disregarded that [substantial] risk" of serious harm to the victim. *Letterman*, 789 F.3d at 862 (citing *Jackson*, 140 F.3d at 1152). "The plaintiff must show [that] the [defendant] 'knew that their conduct was inappropriate in light of' the risk to the prisoner." *Id.* (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). However, "[d]eliberate indifference constitutes more than mere negligence." *Id.* (citing *Farmer*, 511 U.S. at 835). To meet this standard, there must be "more than ordinary lack of due care for the prisoner's . . . safety." *Farmer*, 511 U.S. at 835 (quotation omitted). "Although the level of blameworthiness must rise above negligence, a plaintiff

does not have to show that the [defendants] acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman*, 789 F.3d at 862 (quoting *Farmer,* 511 U.S. at 835). "[T]he obvious inadequacy of a response to a risk may support an inference that the [defendant] recognized the inappropriateness of his conduct." *Krout,* 583 F.3d at 567. Therefore, when deciding whether an actor deliberately disregarded a risk, a court should consider "his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an [individual] in that position," *Gregoire,* 236 F.3d at 419, and a court should avoid determining the question "with hindsight's perfect vision," *Jackson,* 140 F.3d at 1152.

Defendants "who actually knew of a substantial risk to inmate health or safety[, including the risk of cold temperatures in an inmate's cell,] may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. For example, in *Skelton v. Bruce*, the Tenth Circuit held that the plaintiff did not produce sufficient evidence for a rational jury to find that the defendants were deliberately indifferent when one of the defendants, the unit team counselor of plaintiff's "cellhouse," responded to plaintiff's only grievance regarding the cold temperatures in his cell by checking the temperature with maintenance and confirming that the temperature was set to 68 degrees, which was the temperature setting required in the prison's regulations. 409 F. App'x 199, 201, 204-05 (10th Cir. 2010). The court reasoned that, even though the plaintiff "complain[ed] of nighttime temperature drops and that a single temperature check was performed during the day, [the court would] not hold [defendants] liable for what would at most amount to mere negligence." *Id.* at 205. The

court also noted that the plaintiff's allegation that the temperature check was a sham was "pure speculation and [such allegation would] not raise a genuine issue of material fact that [the defendant] acted with deliberate indifference." *Id.*

Likewise, in *Scotti v. Russell*, the district court held that the plaintiff failed to prove deliberate indifference when the defendants, a correctional captain and caseworker supervisor at the prison where plaintiff was located, offered alternative means to protect the plaintiff from the cold, including insulating the windows of the cells, cleaning out the paper that was stuffed in the vents, and maintaining the heating system by having it regularly examined. 175 F. Supp. 2d at 1104. The court stated that this work "indicate[d the defendants'] honest efforts to provide adequate living conditions." *Id.* On the other hand, in *Walker v. Schult*, the Second Circuit held that the plaintiff adequately alleged deliberate indifference on the part of the defendants, which included wardens, associate wardens, a unit manager, and a counselor, and the district court erred by dismissing the complaint when the plaintiff alleged that the defendants knew that the cell was cold in the winter and the conditions in the plaintiff's cell never changed. 717 F.3d at 129-30. The court stated that, while "courts have the power and duty to dismiss complaints that contain only conclusory, frivolous, or implausible allegations, . . . the district court improperly assayed the weight of the evidence[] . . . and failed to draw all reasonable inferences in [the plaintiff's] favor." *Id.* at 128, 130.

In addition, defendants who knew of a substantial risk to an inmate's health or safety may also be free from liability if they do not have the power to correct the condition or conditions of concern. *See Del Raine*, 32 F.3d at 1038. For example, in *Dace v. Smith-Vasquez*, the court held that the defendants were not "indifferent," let alone "deliberately

indifferent," when the plaintiff was given winter clothing and a blanket, and some of the defendants, who were prison employees, addressed plaintiff's complaints about his cold cell by submitting work orders for the heating system, while other defendants, a counselor and public service administrator, did not directly respond to plaintiff's complaints. 658 F. Supp. 2d at 880. The court stated that there was no evidence that "indicate[d] that [the prison employees] had the authority to do anything else" or that the counselor and public service administrator "had the power to treat [p]laintiff's complaints" and that, "[a]t best, the record shows that the [d]efendants might have been negligent." *Id.* at 880-81. On the other hand, in *Diggs v. Godinez*, the court held that summary judgment was inappropriate and a question remained "as to whether [the d]efendants did everything in their power to keep cell temperatures at reasonable levels" when one defendant, a former warden, referred plaintiff's grievances to the chief engineer, and the other defendant, a unit manager/superintendent, issued a standing order to provide inmates with extra blankets. 1997 WL 308847, at *1, *7. The court reasoned that "[t]here [was] no evidence . . . [in the record] that [d]efendants had no power to improve the heat in" plaintiff's unit and that the chief engineer did not start working at the prison until the year after plaintiff began complaining of cold temperatures in his cell. *Id.* at *7.

Here, the question of whether a genuine issue of material fact exists regarding whether Frischmann deliberately disregarded the risk of cold temperatures in Cannady's cell is a much closer question than in the cases previously discussed. Frischmann makes two arguments concerning deliberate disregard. The first argument, which can be disposed of immediately, concerns whether Frischmann deliberately disregarded the risk of cold temperatures by incorrectly setting, or intentionally turning down, the thermostat,

as Cannady claims. *See* Doc. 35, p. 4. Without any other facts substantiating such a claim, Cannady's allegations are pure speculation and will not raise a genuine issue of material fact that Frischmann deliberately disregarded the substantial risk posed by the cold temperatures in his cell.

Frischmann's second argument is that he did not deliberately disregard the risk of cold temperatures in Cannady's cell because, each time Cannady filed grievances about the cold temperatures, a member of maintenance "came into the cell block to check the temperature and addressed any issues they found." *See* Doc. 35, p. 4. Frischmann states that, if anything, such conduct would amount to "mere negligence," which would not satisfy the standard for deliberate disregard. *See id.* In other words, Frischmann argues that this response was reasonable under the circumstances, but the Court finds that genuine issues of material fact persist as to this point.

First, as to Frischmann's heavy reliance on *Skelton* for the contention that his actions amount to, at most, mere negligence, (Doc. 35, p. 4), the Court finds that case distinguishable from the instant one. *Skelton* involved a unit team counselor who inquired with maintenance about the temperatures in the prison and determined that the unit's temperature was set to 68 degrees, which was the temperature setting required in the prison's regulations. *See Skelton*, 409 F. App'x at 201, 204-05. Frischmann, on the other hand, is a supervisor for the maintenance and upkeep of BCDC. (Doc. 26-7, p. 1). A response that is deemed reasonable for a unit team counselor is not necessarily reasonable for a maintenance supervisor whose duties may fairly be assumed to include investigating and fixing malfunctioning equipment or other problems in the jail.

Second, even if temperature checks alone were a reasonable response to complaints about cold temperatures, all the readings here were taken in the cell block and not in Cannady's cell. Frischmann has not presented, and the Court has not found, any evidence in the record that anyone from maintenance, including Frischmann, set foot in Cannady's cell to check the temperatures and/or perform any type of maintenance work. Like the defendants in *Walker*, Frischmann knew about Cannady's complaints of cold temperatures in his *cell*. 717 F.3d at 129-30. Even with this knowledge, the complaints of the cold cell temperatures recurrently persisted without change. *See id.*

Third, the Court cannot absolve Frischmann of liability on summary judgment simply because he makes the conclusory claim that, in response to Cannady's complaints, maintenance "addressed any issues they found." (Doc. 35, p. 4). Unlike the defendants in *Scotti* who did such things as insulate the windows of the cells and clean out paper that was stuffed in heating vents, Frischmann has not noted, and the Court has not located, a single, specific example of how *he* or anyone else from maintenance "addressed" any issues found relating to the cold temperatures in Cannady's cell. Frischmann agrees that the only specific response he or any other maintenance worker under his supervision made after receiving Cannady's complaints was to check the temperatures "in the cell block." *Id.* Furthermore, in Frischmann's responses to some of Cannady's grievances, he admitted that there was some type of problem with the heating in the prison and that "[t]his [was] an issue [they were] working on daily . . . [and they would] get it in sync soon." *See* Doc. 26-7, pp. 16, 19, 26.

Fourth, the Court disagrees that there is no dispute of material fact regarding whether Frischmann was powerless to correct the cold temperatures in Cannady's cell.

In fact, such an argument would be almost inconceivable because Frischmann, as a supervisor of maintenance and upkeep, would likely be in one of the best, if not the best, positions at BCDC to correct, or refer someone to correct, such a condition. Based on the four reasons described above, a reasonable jury could find that Frischmann deliberately disregarded the substantial risk of harm to Cannady.

In sum, viewing all facts and drawing all inferences in favor of Cannady as the non-moving party, while also taking care not to assay the weight of the evidence, this Court finds that genuine issues of material fact remain. Such issues remain, first, as to whether the cold temperatures in Cannady's cell was an objectively serious deprivation under the Eighth and Fourteenth Amendments and, second, as to whether Frischmann was deliberately indifferent to the risk posed by the cold temperatures in Cannady's cell.

### B. Official Capacity Claims

County Defendants also contend that there are no genuine issues of material fact regarding the official capacity claims, and that Cannady has failed to allege any facts that establish an unconstitutional policy or custom related to the cold temperatures in his cell. Although the Court agrees with the Magistrate Judge's ultimate conclusion that these claims should be dismissed, it believes the reasoning behind that conclusion requires some elaboration.

A suit against the Sheriff in his or her official capacity is the equivalent of a suit against the county itself. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998); *see also Kentucky v. Graham*, 473 U.S. 159, 105 (1985). "Thus, the actions of the Sheriff will be deemed actions of the County. . . . [I]n a § 1983 action, a [governmental entity] may only be held liable for constitutional deprivations if the deprivation is the result of a policy or

23

custom of the" governmental entity. *Liebe*, 157 F.3d at 578-79 (citation omitted). A plaintiff seeking to impose liability on a governmental entity under § 1983 must show that the governmental entity "itself cause[d] the constitutional violation at issue. Respondeat superior or vicarious liability will not attach." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "There are two basic circumstances under which [governmental entity] liability will attach: (1) where a particular . . . policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful . . . policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted).

"Because an official policy speaks for itself about the intent of public officials, proof of a single act by a policymaker may be sufficient to support liability." *Jenkins v. Cnty. of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009) (citing *McGautha v. Jackson Cnty.*, 36 F.3d 53, 56 (8th Cir. 1994)). To establish the existence of an unconstitutional policy, a plaintiff "must point to 'a deliberate choice of a guiding principle or procedure made by the . . . official who has final authority regarding such matters.'" *Id*. (quoting *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir. 1999)). In addition to showing the policy is unconstitutional, a plaintiff "must also show that . . . it was 'the moving force' behind the harm that he suffered." *Id*. (quoting *Mettler*, 165 F.3d at 1204). On the other hand, "a custom can be shown only by adducing evidence of a 'continuing, widespread, persistent pattern of unconstitutional misconduct.'" *Id*. at 634 (quoting *Mettler*, 165 F.3d at 1204). In order to establish an unconstitutional custom, "[a] plaintiff must also show either that

policymakers were deliberately indifferent to the misconduct or that they tacitly authorized it." *Id.* (citing *Mettler*, 165 F.3d at 1204).

Here, Cannady has failed to allege any facts that would establish an unconstitutional policy or custom on the part of Benton County. In fact, most of Cannady's claims relate, not to a policy or custom, but to how the County Defendants treated him individually while he was at the BCDC. In his form complaint, Cannady did not describe a policy or custom relating to the County Defendants at all. *See* Doc. 1. The only possible policies or customs that can be adduced from Cannady's hearing testimony that relate to the County Defendants are that: (1) maintenance incorrectly set, or intentionally turned down, the thermostats before the weekends during the winter months; and (2) that maintenance only checked the temperatures in the pod day room when they received complaints regarding cold temperatures. As to the former, without any substantiating evidence, such an allegation is mere speculation and will not serve as a basis to overcome summary judgment on this issue. As to the latter, Cannady has failed to set forth any possible guiding principle or procedure that is made, not by a member of maintenance, but by the government official with final authority regarding the matter. In addition, while Cannady has set forth sufficient facts to survive summary judgment on the issue of deliberate indifference as it applies to Frischmann individually, Cannady has set forth no facts that any *policymakers* were deliberately indifferent, yet alone that any policymakers tacitly authorized the conduct. Stating that Sherriff Cradduck is generally in charge of employee decisions will not suffice to create a genuine issue of material fact in order to survive summary judgment.

In sum, Cannady has failed to allege facts that would establish an unconstitutional policy or custom on the part of Benton County. Therefore, no genuine issues of material fact exist regarding the official capacity claims against the County Defendants, so summary judgment is appropriate on those claims.

### IV. CONCLUSION

The Court, being well and sufficiently advised after its *de novo* review of the record, finds that the R&R (Doc. 34) should be and hereby is **ADOPTED AS MODIFIED**. Accordingly, the Medical Defendants' Motion for Summary Judgment (Doc. 28) is **GRANTED**, and the County Defendants' Motion for Summary Judgment (Doc. 24) is **GRANTED IN PART AND DENIED IN PART**. The County Defendants' Motion is **DENIED** as to Cannady's unconstitutional conditions of confinement claim against Frischmann in his individual capacity based on the cold temperatures in Cannady's prison cell. The Motion is **GRANTED** as to all of Cannady's other claims.

**IT IS SO ORDERED** on this 7th day of March, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE